[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This is a summary process action brought by the plaintiff Harved Realty[1] against the defendants Deborah and Hannah Leekoff.[2] Deborah's parents moved into the premises in the early 1990's; Deborah moved in during the middle 1990's and signed a lease on October 30, 1995.
In the spring of 1997, roaches began to be noticed on the premises of the apartment building. Lisa Hoberman, who testified on behalf of Harved Realty, said there were complaints and the ordinary maintenance procedures used to deal with roaches apparently did not work. The source of roaches was found to be the defendant's apartment. An inspection was arranged in June, 1997, and the conditions were found to be shocking: clutter was piled throughout the apartment such that movement was difficult through the premises. Live roaches were seen about: the clutter was such that it apparently was impossible to clean the apartment. There is no need to recapitulate the compelling testimony and photographs that were introduced, as there seems to be no dispute concerning the condition of the premises in the summer of 1997.
Several officials of the town of West Hartford, in cooperation with the plaintiff and, to a degree, also with the cooperation of the defendant, tried to address the problem of cleanliness and roaches, which had spread to other units and common areas. They arranged for professionals to clean the premises, and the landlord provided a dumpster for the anticipated debris. The defendant cooperated but fitfully; she entered therapy for a compulsive-depressive disorder and depression in July, 1997. On July 17, 1997, a meeting was arranged with town officials and the parties in this action and timetables were established for cleaning up the premises, but the defendant was apparently unable to comply to any significant degree. On July 24 and 25, 1997, the plaintiff sent "Kapa" letters which informed the defendants, pursuant to § 47a-15 of the General Statutes, that they were not in compliance with various sections of the lease which called for compliance with laws and regulations concerning the premises[3] and which required the tenant to keep the premises, fixtures and appliances in a clean and safe condition and to remove all garbage and rubbish in a clean and safe manner. The Kapa letters recited approximately ten inspections which had been conducted since the end of June in which little progress had been made, and stated as well that neighboring apartments had become infested. The notice stated that the lease would terminate on August 28, 1997, unless CT Page 13921 the condition was remedied within twenty-one days.
There still was little progress, and a notice to quit was indeed served on September 10, 1997. When the defendant remained on the premises, the complaint was served on September 30, 1997. The proceedings have taken an extraordinarily long time by summary process standards: hearings were held in February, March and April, 1998; a motion to dismiss intervened; and the parties requested that a transcript be prepared prior to submitting post-trial briefs.
In the meantime, the defendant continued to undergo therapy for her disorder, which therapy by the fall of 1997 was apparently showing results.[4] The town of West Hartford continued to inspect the premises and by December, 1997, the inspector concluded that apartment, while not ideal, was no longer in violation of the health code. The plaintiff's exterminator, who also testified, nonetheless said that he continued to treat for roaches well into 1998.
When the briefs were finally submitted at the end of August, 1998, and I had had the opportunity to review them, I requested that the town perform another inspection. I reasoned that if the issues of the equitable defense were to be reached, it made sense to have a more recent report, as the last one conducted by the town had been performed in December, 1997. The last inspection was performed on October 8, 1998. Archie D'Amato, the inspector, testified that the found an impermissible amount of litter and debris and found the tenant in violation of a housing code ordinance which called for premises to be clean and free of litter. Although he saw no live roaches during his inspection, he saw dead insects on the premises, including dead roaches. He considered the insects to be evidence of roach infestation. He found roaches in roach traps which had been left in the hallway.[5]
The complaint of the plaintiff is rather simple: it alleges a written one year lease which term expired after one year, but renewed automatically for successive one month periods. The complaint alleged lease violations regarding cleanliness and vermin; it alleged the Kapa notice and the notice to quit. It added that on September 3 and September 5, 1997, the violations still existed, and possession of the premises was requested. The answer admits many of the allegations and denies knowledge of the remainder; it alleges four special defenses. The first claims CT Page 13922 that rent was tendered on about September 1, 1997; that the rent was accepted by the landlord; and that, therefore, a new rental agreement was created for September, 1997, such that any past violations were waived. The second alleges that the September rent was accepted after the service of the notice to quiet and, thus, nullified the notice to quit. The third alleges that the defendant has a mental disability which prevented her from complying with the Kapa notice and that by "refusing to accommodate her disability", the defendant has violated Connecticut's Human Rights Act as set forth in § 46a-64c and equity should prevent the relief requested. The fourth defense alleges much the same facts as the third, but claims a violation of the federal Fair Housing Act, 42 U.S.C. § 3601 et seq.
I find the allegations of the complaint[6] proved. There is little or no dispute that, at the times alleged, the conditions created or allowed by the defendant indeed did violate the terms of the lease and, by reference, § 47a-11 of the General Statutes. The defendant does dispute the ability of the named plaintiff to pursue the action; as noted above, that issue was addressed previously and, although I have reconsidered the issue, I come to the same result.
The defendant also claims that she cannot be evicted because of a violation of a lease provision. The lease was apparently not signed by the plaintiff or its representative, although the lease was quite clearly prepared by the plaintiff and a copy not executed by Harved was retained by it. The lease, however, was signed by both Hannah and Deborah Leekoff October 30, 1995, and a landlord-tenant relationship obviously existed. "Of paramount importance to the resolution of this issue is the fact that it is the defendant, the party whose signature is found on the . . . agreement, who is seeking to avoid the [effect of the contract]."Schwarzschild v. Martin, 191 Conn. 316, 320 (1983). "[A ground urged] is that the agreement does not satisfy the Statute of Frauds because it was not signed by the plaintiff. The rule in this regard in this State is that so long as the written contract is signed by the party to be charged, that is sufficient. It is not essential that it be signed by the promisee . . .(citations omitted)." Hansen v. Rackel, 13 Conn. Sup. 455, 457 (1945). As the party against whom enforcement is sought signed the contract, and no serious question has been raised as to the authenticity of the document or the intent of the parties, the terms of the written lease may be enforced.[7]
CT Page 13923
The first special defense does not provide relief to the defendant. It alleges that because payment for September, 1997, was tendered and accepted, and a new monthly lease therefore created, that any previous complaint or difficulty was waived. The short answer is that a new monthly contract was indeed created, but, because the Kapa notice is not a termination notice, there was no effective termination to waive. The defendant had merely been put on notice that the lease could be terminated. Because of the complications of the timing of the various documents, the construction urged by the defendant would have the effect of virtually eliminating the possibility of terminating a month to month lease because of a lease violation.[8]
The second special defense has more substance. The claim in this defense is that rent was tendered on September 1 or September 2, 1997, prior to the service of the notice to quit on September 10, 1997. This defense alleges that the rent was not accepted until September 19, 1997, approximately the time at which the check was presented to the bank. The theory is that acceptance of rent, after termination of the rental agreement by means of the notice to quit, reinstates the lease. The language in the notice to quit to the effect that all payments tenderedafter service of the notice to quit will be treated as payments for use and occupancy would not negate the effect of the acceptance, because the rental payment in this case was tendered prior to the service of the notice to quit. See, e.g., HartfordEast Apartments v. Raum, No. H-7903-00912 (June 19, 1979) (Spada, J.).
If mere retention of the check constituted acceptance, then the defense would have no merit, because the acceptance would have occurred prior to the service of the notice to quit, and the lease would then be terminated by the notice to quit. But the evidence indicates that the defendant was told nothing about the status of the check after she sent it, and the markings on the back of the check clearly indicate that it was not presented to any bank until September 19. The inference is unmistakable that the check was simply retained until after service of the notice to quit.
As stated by Judge Spada: "The defendant's . . . argument is that the plaintiff's retention of the money order from the date of its receipt (April 2, 1979) to the date of the motion to dismiss (April 16, 1979) is tantamount to an acceptance. The CT Page 13924 court disagrees. Mere retention is insufficient. In order to constitute acceptance, retention requires a demonstration of ownership such as an endorsement or an actual cashing of the money order or check. None of this is present in the case at bar." Alteri v. Layton, 35 Conn. Sup. 258, 259-60 (1979). InTuttle v. Martin, 32 Conn. Sup. 297 (1975), Judge Moraghan considered a situation in which there was a month to month lease. In July, 1974, the plaintiff landlord sought to raise the rent to $100 per month. In August, September and October the defendant tenant tendered checks in the prior amount of $80, and on the face of each check it was indicated that the check was for payment of the rent for the applicable rent. The checks were all deposited and apparently endorsed at the end of October. Judge Moraghan noted that "[t]here seems to be little doubt that the acceptance of rent after a forfeiture waives that forfeiture and creates or accepts a new tenancy. Hartford Wheel Club v. TravelersIns. Co., 78 Conn. 355, 359; Camp v. Scott, 47 Conn. 366, 370;Hudson v. Kuszynski, 12 Conn. Sup. 264, 266. It is totally inconsistent for a landlord to accept a rent check, whether absolute or conditional payment, under a nonexisting tenancy."Tuttle, supra, 299. The court concluded that although a long, unexplained retention of a check may tend to show acceptance for the purpose it was given; Borst v. Ruff, 137 Conn. 359, 362; in the circumstances of this case the landlord had the obligation either to return the check or to accept it upon the condition apparent on the face of the check.
In Borst v. Ruff, 137 Conn. 359 (1950), the tenant had attempted to pay rent with checks that were returned for insufficient funds and a notice to quit was served. An attorney for the landlord wrote to the tenant after service of the notice to quit and, inter alia, offered to see what he could do about straightening the matter out. A summary process action was instituted, and, in the meantime, rent checks for four months were tendered. The landlord did nothing with these checks other than retain them. Judgment was entered denying relief for the landlord.
The Supreme Court affirmed. The court noted that a check does not discharge a debt for which it is given until it is honored or paid; if the checks were accepted by the landlord as conditional payment, the tenancy was renewed. The conclusion of the trial court, that the retention of the checks for months at a time in the circumstances of this case was inconsistent with the termination of the tenancy, was not unreasonable. In Borst, then, CT Page 13925 acceptance by inference after service of the notice to quit renewed the tenancy, and the eviction could not proceed successfully. See also O P Realty v. Santana,17 Conn. App. 314, 317 (1989) ("an acceptance by the landlord of a render of rent after the service of a notice to quit renders the notice void and creates a new tenancy").
It is black letter law in this state that "a landlord may accept a tender of rent after the service of a notice to quit and characterize it as payment for use and occupancy if the landlord has, prior to the offer of rent, notified the tenant that the tender will be accepted only as use and occupancy payments. O PRealty, supra, 318.
The evidence in this case discloses an ineluctable trilogy: there first was a tender of rent, then service of the notice to quit with the disclaimer to the effect that any tender of rent would be treated as payment for use and occupancy, then acceptance of the tender of rent. In the e circumstances, then, the second special defense has been proved.
As the issue may arise again, some brief discussion of the third and fourth defenses may be useful.[9] These defenses allege unlawful discrimination in violation of both state and federal fair housing and anti-discrimination statutes. At the risk of oversimplification, I find that the defendant is a disabled person for the purpose of falling within the class of persons protected by the legislation. I find that the plaintiff as of July 17, 1997, was aware of facts on which it should have known there was a mental disability, though not necessarily the precise nature of the disability. I also find, however, that the plaintiff did not "refuse to make reasonable accommodations in rules, policies, practices or services, when accommodations may be necessary . . ." 42 U.S.C. § 3604 (f)(3)(B). To the contrary, the plaintiff worked with the defendant's problems but, when faced with roach infestation which created a health hazard, not to mention unpleasantness, for other tenants, the landlord may well have had the obligation to proceed with summary process proceedings. See also 42 U.S.C. § 3604 (f)(9). I find that the plaintiff did make the accommodations which were reasonable in the circumstances.
Finally, in light of the disability of the defendant and the passage of time, I considered viewing the third and fourth defenses as more traditional equitable defenses. See, e.g., CT Page 13926Fellows v. Martin, 217 Conn. 57 (1991). If the premises had been reasonably clean for the better part of a year, then eviction may well have created a serious hardship to the defendant and only a marginal benefit to the plaintiff. As the inspection of October 8, 1998, showed, however, that the premises were again in violation of the applicable code, I would not have granted equitable relief.
Judgment may enter for the defendant.
Beach, J.